IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| JAQUELINE MASSEY, *as* | ) | |
| *Administrator of the Estate of* | ) | |
| *Cameron Massey,* | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:15-cv-739-RAH-SMD |
| | ) | (WO) |
| RALPH CONNER and | ) | |
| JOHN PHILLIPS, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

This § 1983 action involves a set of facts that has become far too familiar in the courts and media alike, wherein an unarmed citizen is killed by law enforcement officers during a traffic stop. These lawsuits present courts with the difficult task of analyzing the actions of both officers and citizens during what can be highly stressful, unpredictable, and rapidly evolving interactions.

The Plaintiff in this case, Jaqueline Massey, sues on behalf of her son, Cameron Massey, who was shot and killed by law enforcement officers during a traffic stop in 2013. She alleges that Defendants Ralph Conner, the retired Chief of Police for the City of Eufaula, Alabama, and Sergeant John Phillips, a detective with the Eufaula Police Department, violated her son's rights under state and

constitutional law. She brings a Fourth Amendment excessive force claim and an Alabama state law claim for wrongful death.

Pending before the Court are numerous motions filed by Conner and Phillips, including a motion for summary judgment (Doc. 133), motions to exclude expert witnesses (Docs. 136, 138), a motion to exclude Massey's supplemental disclosures (Doc. 145), and three motions to supplement Conner and Phillips' summary judgement motion (Docs. 180, 185, 186). For the following reasons, the Defendants' Motion for Summary Judgment is due to be granted.[1]

## JURISDICTION

The Court exercises subject matter jurisdiction over this dispute pursuant to 28 U.S.C. §§ 1331 and 1343, but the Court elects not to retain supplemental jurisdiction over the state law claim under § 1367. Personal jurisdiction and venue are uncontested.

## LEGAL STANDARD

Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits show that there is no

---

[1] Conner and Phillips's initial brief in support of their motion was 159 pages long and their reply to Plaintiff's opposition was 188 pages long. This briefing is in addition to thousands of pages of evidence and hundreds of pages of supplemental filings filed by these Defendants. The Court makes note of this because, despite the very serious issues presented by this case—issues that deserve thoughtful briefing and the Court's careful attention—counsel have done their clients a disservice by over-briefing and over-complicating this matter. These voluminous filings resulted in a months-long delay while the Court poured through hundreds of pages of attorneys nitpicking even non-dispositive details. This case was one of several that prompted this Court to implement page limits for all future briefing.

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(a), (c). No genuine issue of material fact exists if the opposing party fails to make a sufficient showing on an essential element of her case as to which she would have the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

The "mere existence of a scintilla of evidence in support of the [non-moving party's] position" is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 252 (1986). To prevent summary judgment, a factual dispute must be both material and genuine. *Id.* at 247–48. A fact is "material" if it has the potential of "affect[ing] the outcome" of the case. *Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1303 (11th Cir. 2016) (quoting *Anderson*, 477 U.S. at 248). And to raise a "genuine" dispute of material fact sufficient to preclude summary judgment, the nonmoving party must point to enough evidence that a reasonable juror could return a verdict in her favor. *Shaw v. City of Selma*, 884 F.3d 1093, 1098 (11th Cir. 2018).

When considering the record on summary judgment, "the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in [her] favor," *id.* (quoting *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (per curiam)), but "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record," a court should not adopt that version of the facts for

purposes of ruling on a motion for summary judgment, *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Further, in cases where a video in evidence obviously contradicts the nonmovant's version of the facts, the Court accepts "the video's depiction instead of the [nonmovant's] account," *Pourmoghani-Esfahani v. Gee*, 625 F.3d 1313, 1315 (11th Cir. 2010), and "view[s] the facts in the light depicted by the videotape," *Scott*, 550 U.S. at 380–81. But where the video does not answer every question or resolve all the details of an encounter, the Court views the evidence in the light most favorable to the non-moving party, *Johnson v. City of Miami Beach*, 18 F.4th 1267, 1269 (11th Cir. 2021), where there is "material evidence in the record supporting both [parties'] accounts," *Cantu v. City of Dothan*, 974 F.3d 1217, 1227 (11th Cir. 2020) (quoting *Smith v. LePage*, 834 F.3d 1285, 1296 (11th Cir. 2016)).

## BACKGROUND

The parties to this matter vigorously disagree about the events that transpired during the traffic stop that ultimately resulted in Cameron Massey's death. In her Amended Complaint and summary judgment briefing, Jacqueline Massey paints a picture of compliance by Cameron Massey with officer commands and the lack of threat to any officer or bystander that necessitated the use of deadly force against Massey.  But Jaqueline Massey was not present on the scene, and her assertions

and contentions are not evidence. The Court recognizes that it must draw reasonable inferences in Jaqueline Massey's favor when her contentions are supported by the record. But where they are not, the Court must instead accept a version of events that is consistent with the evidence, which here includes video footage and testimony from eyewitnesses, some of whom are parties to this case and some of whom have no stake in the outcome whatsoever. And as the United States Supreme Court noted in *Celotex,* "[o]ne of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims." 477 U.S. at 323–24. Accordingly, the Court provides the following summary of material facts based on the evidence filed in the record, not unsupported contentions or allegations.

### A.     The Traffic Stop and Shooting

#### a.     The Informant Tip

On Tuesday, October 15, 2013, Jason Benefield, a narcotics detective with the Eufaula Police Department, received a tip from a confidential informant that a man named Cameron Massey would be transporting a large quantity of marijuana from Atlanta, Georgia to Eufaula, Alabama in a black, four-door Infiniti displaying a Georgia-issued disabled veteran license plate. (Doc. 134-3 at 4.) Detective Benefield relayed this information to Defendant John Phillips, a fellow narcotics detective with the Eufaula Police Department. Phillips knew that this particular

informant was reliable because Phillips had made at least four previous drug arrests based on this individual's tips. (*Id*.)

After receiving the information from Detective Benefield, Phillips drove his marked police vehicle to U.S. Highway 431 north of Eufaula to set up surveillance. Phillips's patrol vehicle was not equipped with a dash camera, and he did not wear a body camera.

Around 4:30 p.m., Phillips observed a black, four-door Infiniti with a Georgia-issued disabled veteran license plate traveling southbound on Highway 431 toward Eufaula. The vehicle's characteristics and direction of travel were consistent with the informant's tip, so Phillips began to follow the car. (*Id.* at 5.) He observed that the expiration decal on the license plate was torn, making the tag's expiration date illegible, and observed that the Infiniti failed to maintain a single lane of travel.

### b.    The Traffic Stop

Phillips then activated his blue lights and siren to signal the Infiniti to stop. The Infiniti turned into the unpaved driveway of a nearby automotive repair shop, drove through an open gate, and eventually stopped outside of the auto shop. (*Id*. at 6.) The shop was open for business and was occupied by staff and customers.

Phillips parked his patrol car behind the Infiniti. The driver of the Infiniti, Joshua Kelly, immediately got out and walked toward Phillips's patrol car. (*Id.* at

7; Doc. 134-38.) Phillips met Kelly at the front of his patrol car and instructed Kelly to get back into the Infiniti, but Kelly instead paced back forth between the two vehicles, expressing his frustration at being pulled over. (Doc. 134-3 at 7; Doc. 134-12 at 33.) When Kelly eventually opened the driver-side door of the Infiniti, Phillips observed Cameron Massey,[2] the subject of the confidential informant's tip, sitting in the passenger seat. (Doc. 134-3 at 7.) Phillips claims he also smelled the odor of marijuana coming from inside the Infiniti. (*Id.*)

Phillips returned to his patrol car and called for backup. Kelly again walked toward Phillips's patrol car. As Phillips explained his reasons for the stop, Kelly took out his cell phone and made a phone call. (Doc. 134-12 at 12–13.) Phillips asked Kelly several times to hang up the phone, but Kelly ignored his requests. (Doc. 134-3 at 8; Doc. 134-38.)

At 4:40 p.m., about ten minutes into the traffic stop, Defendant Ralph Conner, then-Chief of the Eufaula Police Department, arrived on the scene. (Doc. 134-1 at 4.) His patrol car was not equipped with a dash camera.

As Conner approached Kelly and Phillips, Kelly was still on the phone. (Doc. 134-12 at 13.) Phillips pointed out the torn decal and told Conner that he had asked Kelly to end his phone call. (Doc. 134-3 at 8.) Kelly was argumentative with the two officers and at one point raised his hands to his chest level, prompting

---

[2] Phillips recognized Massey because Phillips had previously seen a photograph of Massey. (Doc. 134-3

Conner to admonish him to "get [his] hands down" and "don't ever do that." (Doc. 134-35 at 14; Doc. 134-12 at 13.) Conner activated his body-worn camera at 4:41 p.m., which captured audio and partial video of the remaining events.[3] (Doc. 134-29.)

When Conner activated his body camera, he, Phillips, and Kelly were standing behind the Infiniti on the driver side, while Massey remained seated in the passenger seat. Once Kelly ended his phone call, Phillips said to him "let's talk about the odor of marijuana coming from the vehicle." (*Id.*) While Phillips spoke with Kelly, Conner approached the driver side and asked Massey through the open window if he had any identification, to which Massey replied that he did not. As Conner spoke with Massey through the window, Kelly walked away from Phillips and approached Conner from behind. Conner ordered Kelly to return to the rear of the Infiniti where Phillips put Kelly into handcuffs for the officers' safety. (Doc. 134-12 at 15.) Conner then instructed Massey to put his hands on the dashboard, and Massey complied. (Doc. 134-29.)

c.    **The Shooting**

---

at 7.)

[3] Due to the placement of Conner's body camera on his shirt, Conner's video does not provide a full visual account of the pertinent events leading up to and during the shooting. Depending on where Conner stood and how his body was angled, the camera at times pointed away from the action, or captured only a partial image of the Infiniti. To fill in the gaps of what is not fully depicted on video, the Court relies on the audio footage, eyewitness statements, and deposition testimony, construing the facts in the light most favorable to the nonmovant where that version of the facts is not contradicted by the record evidence.

After Massey put his hands on the dashboard, Conner began to circle around to the front of the Infiniti to approach Massey on the passenger side. (Doc. 134-29.) As Conner approached, Massey removed at least one of his hands from the dashboard and began moving around inside the Infiniti. (*Id.*) Conner believed Massey may have been searching for a weapon. (Doc. 134-6 at 60, 62, 118.) Conner then shouted at Massey "On the dashboard! On the dashboard! Put your hands on the dashboard!" (Doc. 134-29.) Massey did not comply with Conner's commands, prompting Conner to draw his weapon and attempt to open the locked passenger door. As Conner pulled on the handle, Massey leaned across the center console toward the driver's seat. Conner yelled to Phillips, "Watch this guy! He's getting out. He's getting out!" (*Id.*)

In response, Phillips ran to the driver-side door of the Infiniti where he observed Massey leaning into the driver-side floorboard. (Doc. 134-3 at 10; Doc. 134-39.) Believing Massey was potentially reaching for a weapon under the driver's seat, Phillips leaned the upper half of his body through the open driver-side window into the Infiniti (Doc. 134-3 at 10–11; Doc. 134-9 at 23) and ordered Massey to get out of the floorboard area (Doc. 134-3 at 11). Phillips drew his weapon with his right hand and with his left grabbed Massey's shirt and hair at the base of his neck to pull him out of the floorboard area. (*Id.*)

Seeing Phillips engaged with Massey, Conner ran to the rear of the Infiniti to put Kelly on the ground. (Doc. 134-29.) Massey and Phillips continued to struggle inside the Infiniti, where Massey punched at and grabbed at Phillips.[4] (Doc. 134-3 at 11; Doc. 134-9 at 30.) At some point during this struggle, Massey started the Infiniti's engine and shifted the car into drive. (Doc. 134-3 at 11; Doc. 134-9 at 30.) He then pressed the accelerator with his hand. The car's engine revved and its tires spun. (Doc. 134-29.)

At this point, from Conner's perspective, Massey still had ahold of Phillips, with the upper half of Phillips's body inside the Infiniti's driver-side window. (Doc. 134-1 at 9.) The angle of Conner's body camera only captures the passenger side of the Infiniti, but the video shows Conner run back to the passenger side, weapon drawn, and just after the Infiniti lurches forward, Conner fires one shot through the front passenger window. (Doc. 134-29.) Conner's shot did not stop the Infiniti's forward trajectory.

As the Infiniti moved forward, Phillips testified that his legs were dangling outside of the Infiniti. (Doc. 134-3 at 11; *see also* Doc. 134-9 at 24.) According to Phillips, at that moment he feared he would be dragged underneath the Infiniti and

---

[4] As to Phillips's use of deadly force, Jaqueline Massey's opposition brief argues that Phillips never, until his deposition, testified that Cameron Massey punched and grabbed at him when he leaned into the Infiniti. (Doc. 159 at 25–26.) True enough, Phillips admitted during his deposition that he initially did not disclose that fact because Massey was unsuccessful in his attempts to punch and grab Phillips, so he did not view the physical altercation as a significant detail. (Doc. 134-7 at 64–65.) But Phillips is not alone in

hurt or killed. (Doc. 134-3 at 11.) Then, hearing the sound of Conner's gunshot, Phillips believed Massey had fired a weapon. (*Id.*) Phillips then fired his own weapon four times as the Infiniti moved uphill toward the auto shop, eventually colliding with a parked pickup truck.[5]

Conner ran to his patrol car and transmitted a "double-zero" officer-in-distress call and requested an ambulance. (Doc. 134-29.) He then ran to secure Kelly, who was laying handcuffed on the ground in front of Phillips's patrol car. Kelly began asking Conner what happened, but because the audio is muffled and because he and Conner spoke over one another, Kelly's exact questions are unclear. Conner responded, "he tried to run the officer down" and "we can't let him run an officer down," to which Kelly said "I know, I know. I don't know man. I don't know." (*Id.*)

Back at the top of the hill, Phillips pulled himself out of the Infiniti and walked down the hill toward Conner and Kelly. As Phillips approached, Conner said, "I thought he was going to run you down" and then, though a bit muffled, "He was cranking up and you were trying to hang on to him, I thought he was going to drag you." Phillips responded, "He was dragging me." (*Id.*)

---

his assertion that Cameron Massey hit and grabbed at him. Conner likewise testified to this fact (Doc. 134-6 at 75–76, 86, 90), as did eyewitness Garrick Hall (Doc. 134-39; 134-9 at 30).

[5] Although the Court attempts to recite these events in careful detail, it is important to note that the time elapsed between Conner's initial verbal exchange with Cameron Massey and the first gunshot is a mere thirty-two seconds, which demonstrates just how rapidly these interactions occurred.

Phillips and Conner began to search Kelly while Phillips recited the *Miranda* warnings. As the officers removed items from his pockets, Kelly interjected, saying "I don't know what made the motherfucker get over here and do that shit." Conner interrupted Kelly and continued to read the *Miranda* warnings from a laminated card. (*Id.*)

### d.     The Subsequent Investigation

As Conner and Phillips finished with Kelly, Officers Tyler Sima and Steven Webb arrived on the scene. As Webb approached Conner, Conner asked Webb to write down the names and addresses of any witnesses to obtain statements. (Doc. 134-29.) Conner's body camera video ends here.

Officer Sima activated his personally-owned eyeglass camera once he arrived on the scene. Sima's video shows that the Infiniti's engine was still running, music was playing, and the windshield wipers still moving. (Doc. 134-37.) Sima worked with several other officers to process the Infiniti, including collecting bullet casings and looking under the seat in search of a firearm. (Doc. 134-37.) No firearm was found in the Infiniti, but seven pounds of marijuana were found inside the trunk, wrapped in plastic, and hidden inside a box containing DVD movie cases. (Doc. 134-49.)

Massey was removed from the Infiniti and transported by ambulance to a local medical center where he was pronounced dead as a result of a gunshot wound to the chest. (Doc. 134-59 at 3.)

### e. Kelly's Post-Shooting Statement

After handing over his search of the Infiniti to other officers, Sima drove Kelly to the Eufaula Police Department where Kelly gave a video-recorded statement to Corporal Souders as part of the Alabama Bureau of Investigation's (ABI) inquiry into the shooting. (Doc. 134-38.)  In his statement, Kelly confirmed that he had smoked marijuana inside the Infiniti as he drove back to Eufaula. (Doc. 134-12 at 12.)

Kelly also described Conner's arrival on the scene, saying that Conner asked Massey for his full name and commented "I know you, don't I? We know each other, don't we?" to which Massey responded, "yeah."[6] (Doc. 134-38; Doc. 134-12 at 34.)

As to the events leading up to the shooting, Kelly recalled seeing Conner knock on the passenger-side window with his weapon drawn. (Doc. 134-12 at 16.) He noted that Phillips was positioned on the driver side of the Infiniti and that Massey "was in the driver's side." (*Id.*) He then heard yelling and the Infiniti's

---

[6] The Court acknowledges that Kelly's statement constitutes hearsay.  However, at the summary judgment stage, the Court is permitted to rely upon hearsay if it would be reducible to admissible evidence at trial. *See Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293–94 (11th Cir. 2012).

engine rev. Afraid he would be run over, Kelly ran away from the Infiniti toward Phillips's police car, at which point he heard several gunshots. (*Id.* at 21–22.)

Kelly told Souders that he remembered Phillips "being dragged by the car" and saw "his arm or something in the car." (*Id.* at 22.) Kelly also said that after the shooting, he heard Phillips say, "I was scared he was going to run me over." When Souders asked for clarification regarding Phillips being dragged by the Infiniti, Kelly clarified, "I can't say it was dragging, all I know is his arm was in there" (Doc. 134-12 at 24) and "Man, his arm was in there . . . all I know he was in there" (*Id.* at 22–23). When Souders questioned whether "he was going with the car," Kelly responded, "right." (*Id.* at 24.)

When Souders asked Kelly why Massey would "take off like that," Kelly responded that he did not have "the slightest . . . idea" and that he had only known Massey for six months. (*Id.* at 25.) Kelly concluded his interview by asking if Massey was dead, offering to cooperate with the investigation, and telling Souder "I don't know what made him do it." (*Id.* at 37.)

### f.    Garrick Hall's Eyewitness Testimony

As part of its investigation, the ABI took a statement from an eyewitness named Garrick Hall, a man who worked at the auto shop where the traffic stop and shooting occurred. (Doc. 134-39.) Hall also signed a sworn declaration and gave deposition testimony as part of this lawsuit. (Doc. 134-9.)

In his audio statement, Hall recounted the shooting incident, saying that he was standing in front of the auto shop when he saw the Infiniti pull into the driveway followed by a police car with its lights on. (Doc. 134-39.) Hall was on a break from work, so he watched the interaction. He saw the driver of the Infiniti outside the vehicle speaking with police officers and watched as one of the officers handcuffed the driver and lay him on the ground. (*Id*.)

Hall also claims that he saw the passenger "hop over in the driver's seat" and an officer run up to the open driver-side window and "wrestle with" the passenger. (Doc. 134-8 at 4.) Hall said he then saw the car "take off" with the officer "in the window, kind of sideways; feet was off the ground when the car was moving." (*Id*.) Hall confirmed that the officer inside the vehicle drew his gun as the vehicle was moving. He then heard four shots, which prompted him to run inside the building. (*Id.* at 5.)

During his deposition, Hall clarified that his line of sight allowed him to see the front and driver side of the Infiniti, but he could not fully see the passenger side.[7] (Doc. 134-9 at 25.) Hall testified that his initial statement that the passenger

---

[7] Jaqueline Massey challenges Hall's deposition testimony that Phillips was being carried away by the Infiniti because Hall previously had signed a written statement stating that Phillips appeared to be in control of his body as the Infiniti traveled up the hill toward the auto shop. (Doc. 159 at 40.) After signing this statement, Hall clarified in his deposition testimony that after Massey reached into the driver-side floorboard, Phillips leaned into the Infiniti and "from his waist up was in the window" when the car started to move. (Doc. 134-9 at 23.) He confirmed that he believed Phillips had control of his body and did not appear to be falling to the ground, but that as the Infiniti move forward, Phillips's body "was in there pretty good" and that he was not running alongside the vehicle, but rather "his feet was off the

"hopped" into the driver side was more accurately characterized as "leaning" over to the driver side. (Doc. 134-9 at 12.) Hall could not see Massey's head and presumed that he was pressing the accelerator with his hand because the lower half of Massey's body was still in the passenger seat. (*Id.* at 56.)  Hall testified that while the Infiniti was moving forward, Phillips had control of his body and never fell or appeared to be falling to the ground (*Id.* at 13), but that Phillips's legs were up off the ground as the car was moving and his body was "in there pretty good" (Doc. 134-9 at 23).

### g.      Phillips's Post-Shooting Testimony

Following the shooting, Phillips gave a video-recorded statement to an ABI investigator (Doc. 134-32), signed a sworn declaration (Doc. 134-3), and gave deposition testimony (Doc 134-7). Phillips also posed for photographs that showed bruising on both of his triceps. (Doc. 134-33.)

Phillips's post-shooting testimony recounted the day's events of Phillips receiving the informant tip, spotting and stopping the Infiniti, and interacting with a frustrated Kelly when Conner arrived on the scene. Phillips stated that as he handcuffed Kelly during the stop, he was alarmed to hear Conner loudly command Massey to put his hands on the dashboard and then yell "he's getting out!" (Doc. 134-3 at 10.) Phillips ran to the driver side where he saw Massey leaning across the

---

ground." (*Id.*) The Court does not find Jaqueline Massey's claimed inconsistency persuasive or materially

center console, reaching underneath the driver's seat. (*Id.*) Based on the informant's tip that Massey was transporting a large quantity of drugs and the odor of marijuana, Phillips said he believed Massey may have been searching for a weapon. (*Id.*)

Phillips recounted that he leaned into the open driver-side window and ordered Massey out of the floorboard as he grabbed Massey's hair and collar with his left hand and drew his firearm with his right. (*Id.* at 11.) As Phillips and Massey struggled, Massey started the Infiniti, shifted it into drive, and pressed the accelerator with his hand. (*Id.*) The Infiniti "bolted forward" with the upper half of Phillips's body inside the window. (*Id.*) As the car took off, Phillips heard a gunshot. Phillips not only thought that Massey had fired a weapon at him but was also concerned that he could be dragged underneath the vehicle. Fearing for his life, Phillips said he braced his triceps on the windowsill to hold up his body weight and fired his weapon four times at Massey.[8] (*Id.* at 12.) After the Infiniti came to a stop, Phillips removed himself from the window, and walked back toward his police car as other officers arrived to take over the scene.

---

significant.

[8] Jacqueline Massey further argues that there is no evidentiary support that Phillips was being dragged by the Infiniti because he did not have scuff marks on his boots and because there were no drag marks in the gravel along the path the vehicle traveled. (Doc. 159 at 28–33, 39.) But the argument that Phillips was not being carried away by the Infiniti is belied by the record evidence, including the testimony from a neutral eye-witness.

During his deposition, Phillips testified about his knowledge of the Eufaula Police Department's use-of-force policies (Doc. 134-7 at 11–14), drawing weapons (*Id*. at 18–21), and shooting into a vehicle (*Id*. at 14–16). Phillips also testified that narcotics arrests are more dangerous than others because drugs and weapons go "hand in hand," and that this knowledge played a factor in his assessment of the events as they transpired during the traffic stop and shooting. (*Id*. at 35.) Phillips confirmed that when he initially saw Massey reaching under the driver's seat, he did not believe he was authorized to use deadly force on Massey, but instead, attempted to de-escalate the situation by issuing verbal commands and trying to pull Massey up out of the floorboard. (*Id*. at 41–42.)

When asked what objective factors would support his eventual use of deadly force, Philips testified that a reasonable person would have seen that Massey had no intent to comply with officer commands despite several opportunities to do so; the officers were investigating possible possession of a trafficking amount of narcotics; Massey's frantic, desperate search for something in the floorboard; and Massey starting the engine, engaging the transmission, and pressing the accelerator with his hand while Phillips was leaning into the Infiniti through the window. (*Id*. at 50–52, 57.)

### h.    Conner's Post-Shooting Testimony

Like Phillips, Conner gave a video interview to an ABI investigator (Doc. 134-35), sat for a deposition (Doc. 134-6), prepared a written report about the shooting, and signed a sworn declaration (Doc. 134-1).

Conner's testimony recounted his recollection of the traffic stop and shooting. He told the ABI investigator that he traveled to the scene of the traffic stop after hearing Phillips's request for assistance. When he arrived, he did not discuss with Phillips why the stop had been made but he did hear Phillips ask Kelly about the odor of marijuana inside the vehicle. (Doc. 134-35 at 14–16.) Conner said that after he instructed Massey to put his hands on the dashboard and Massey removed them, Conner was concerned that Massey may have been looking for a weapon. (*Id.* at 17–19.) When Conner tried to open the passenger door, Massey lunged across the console, prompting Conner to yell at Phillips that Massey was trying to exit the vehicle. Conner watched as Phillips leaned into the driver-side window and physically engaged with Massey. Then, when the engine started, Conner believed Massey was going to drive away with Phillips hanging out of the window. (*Id.* at 21.) Unsure if Massey had a gun and believing Massey's action could kill Phillips, Conner chose to fire his weapon through the passenger window in an attempt to protect Phillips. (*Id.* at 22.) Because he did not have a clear line of sight as the Infiniti moved forward, Conner did not shoot again out of fear he might hit Phillips. (*Id.* at 22–23.)

Conner confirmed to the ABI investigator that he was unaware of any other exits leading off the auto shop property and was unconcerned that Massey may have been trying to escape; rather his concern was the threat created by the car dragging Phillips down the gravel driveway. (Doc. 134-35 at 33.) Conner said he had no way to deploy a taser through the locked door and closed window. He told the investigator that events unfolded "so quick" and eventually "became a deadly issue." (*Id.*)

During his deposition, Conner was pressed on his knowledge of the law and policies surrounding the use of force. He testified that he understood an officer's use of force must be both subjectively and objectively reasonable and could be used in situations where there is an imminent threat of serious harm or death to an officer or another person. (Doc. 134-6 at 12–39.) Conner testified that he believed he was entitled to use deadly force on Massey because of "the deadly threat [Massey] was creating" and his belief that Phillips's "life was in danger." (*Id.* at 43–44.)

Conner also testified that at the time of the traffic stop, he did not know Kelly or Massey and was unaware of the narcotics, or the suspicion of them, inside the vehicle. (*Id.* at 52.) He said a number of factors caused him concern at the scene, including that Massey did not have identification, that Kelly had tried to approach him from behind, that Phillips had asked Kelly about the odor of

marijuana, and that Massey failed to comply with instructions to keep his hands on the dashboard and instead "frantic[ally]" moved around as if he was searching for something inside the car. (*Id.* at 54, 56–59.) Conner agreed that at the time he initially drew his gun, he did not believe deadly force was necessary, but rather that the situation was "escalating, becoming threatening." (*Id.* at 60.)

Conner said he eventually shot at Massey after Massey "created an imminent threat of death or serious injury to Officer Phillips" because "Phillips was about to be transported away by the car" and was "not secured in the car." (*Id.* at 91.) He continued that Phillips "was partially hanging in, partially out [of the vehicle]. He [was] in grave danger." (*Id.*)

By shooting into the vehicle, Conner said his hope was that he would hit Massey in the lower part of his body, causing Massey to take his hands off the gas pedal and prevent him from being able to accelerate the vehicle. (*Id*. at 91–92.)

### i.    The Investigative Findings

Following the shooting, ABI conducted a criminal investigation into Phillips's and Conner's actions. The results of this investigation were compiled in a report largely prepared by Corporal Souders. (Doc. 134-44.) Souders summarized the traffic stop and shooting based on his interviews with the officers, Kelly, and eyewitness Garrick Hall. Souders noted in his report that four shell casings and one projectile were recovered from inside the Infiniti, as was a compressed block of

marijuana. (*Id.* at 9, 12.) His findings were later presented to a Barbour County grand jury, which declined to indict either Conner or Phillips and recommended no further criminal action. (Doc. 134-51.)

### B.    The Parties' Expert Witnesses

Between the parties, a total of ten experts were retained to review various aspects of this case. Among these experts were an audio-visual consultant, a drug analyst, forensic pathologists, firearm examiners, a crime scene reconstructionist, and police procedures experts. The experts largely agree on the following events in this case: the Infiniti moved forward after Massey leaned into the driver-side floorboard, engaged the transmission, and pressed the gas pedal with his hand; Conner fired a single gunshot from outside the car, striking Massey in the buttocks; Phillips's body was at least partially inside the Infiniti as it moved forward; Phillips's weapon fired at Massey from point-blank and close-to-intermediate range after the Infiniti began moving;[9] and one of Phillips's four shots ultimately killed Massey. (*See generally* Docs. 134-10; 134-11; 134-13; 134-14; 134-53; 134-54; 134-55; 134-57.) Because an exhaustive analysis of the extensive expert testimony is unnecessary in the context of the Court's summary judgment decision,

---

[9] In fact, the Plaintiff's retained forensic pathologist agrees that Massey's gunshot wounds did not occur at a distant range, but rather, that at least one shot was fired at point blank range, with the gun's muzzle touching Massey's clothing, while the other three shots were at close enough range that Phillips's weapon would have been inside the vehicle when it fired. (Doc. 134-13 at 127, 134–35, 140, 151; Doc. 134-53 at 5, 34; Doc. 134-54 at 16; Doc. 134-57 at 75–76.)

the Court does not summarize every expert finding and will deny all pending *Daubert* motions as moot.

### C.    The Parties' Disputes of Fact

To be clear, the Court agrees that there are plenty of disputes surrounding the details of what transpired during the traffic stop and shooting. The Court cannot agree, however, that there are *genuine* disputes as to the *material* facts that are dispositive here, including that: (1) Cameron Massey disobeyed repeated officer commands; (2) Cameron Massey leaned over into the driver-side floorboard, started the Infiniti's engine, and pressed the gas pedal; (3) Phillips's body was at least partially inside the driver-side window as the Infiniti moved forward; (4) Conner fired his weapon only after the Infiniti began to move; and (5) Phillips fired his weapon after hearing another gunshot and as he was being carried along with the Infiniti.

For a jury to find in Jaqueline Massey's favor as to her version of events surrounding the shooting, the jury would have to ignore or disbelieve the testimony of all four eyewitnesses, the body camera's full audio and partial video footage, and the physical evidence, and instead rely on speculation. As the Eleventh Circuit has long noted, "inferences based upon speculation are not reasonable." *Marshall v. City of Cape Coral*, 797 F.2d 1555, 1559 (11th Cir. 1986). After all, "[s]peculation does not create a *genuine* issue of fact; instead, it creates a false

issue, the demolition of which is a primary goal of summary judgment." *Cordoba v. Dillard's, Inc.,* 419 F.3d 1169, 1181 (11th Cir. 2005).

After carefully reviewing the record in this case, the Court cannot find, at least as to the material facts at issue here, that Jaqueline Massey's contentions are supported by the evidence. As a result, the Court will proceed with analyzing the Defendants' summary judgment motion based on the facts presented by the record evidence.

## DISCUSSION

Jaqueline Massey brings a Fourth Amendment excessive force claim and a state law wrongful death claim against Conner and Phillips. Conner and Phillips move for summary judgment on both.

## Excessive Force Claim

In Count I, Jaqueline Massey alleges that Conner and Phillips violated Cameron Massey's "clearly established right to be free from unreasonable seizure" under the Fourth Amendment to the United States Constitution by employing deadly force during the traffic stop that resulted in Massey's death. (Doc. 62 at 16.) According to Jaqueline Massey, the circumstances of the stop did not warrant the use of deadly force, if any force at all.

Fourth Amendment principles are well-established. Determining whether the force used in making a seizure is "reasonable" requires balancing of the

individual's Fourth Amendment interests against the relevant government interests. *Graham v. Connor*, 490 U.S. 386, 396 (1989). The operative question in excessive force cases is "whether the totality of the circumstances justifie[s] a particular sort of . . . seizure." *Tenn. v. Garner*, 471 U.S. 1, 8–9 (1985).

The reasonableness of the use of force is evaluated under an objective inquiry that pays "careful attention to the facts and circumstances of each particular case." *Graham*, 490 U.S. at 396. The reasonableness of a particular use of force "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Cnty. of Los Angeles v. Mendez*, 137 S. Ct. 1539, 1546 (2017) (quoting *Graham*, 490 U.S. at 396). This evaluation must be based upon the "information the officers had when the conduct occurred." *Id.* at 1547 (quoting *Saucier v. Katz*, 533 U.S. 194, 207 (2001)). Considering all the relevant circumstances, if an officer carries out a seizure that is reasonable, there is no valid excessive force claim. *Id.*

Whether an officer used excessive force depends on the facts and circumstances of each individual case, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 8 (2021) (per curiam) (quoting *Graham*, 490 U.S. at 396).

As to the excessive force claim, both Conner and Phillips assert their entitlement to qualified immunity. Conner also raises the additional defense of abatement. The Court will first address Conner's abatement defense, and quickly dispense with it.

## A.    Abatement

Conner argues that the § 1983 claim against him abated upon Cameron Massey's death. "Because federal law does not address the survival of civil rights actions," Conner contends that "Alabama's abatement law governs the survival" of Jaqueline Massey's § 1983 claims, namely Alabama's Wrongful Death Act. (Doc. 134 at 97–98.) Because this Act requires that a lawsuit may only be brought against a tortfeasor who "caused" the death of the decedent, Conner argues that summary judgment must be granted in his favor because the parties agree that the bullet fired from his weapon was not the one that killed Cameron Massey. (Doc. 134 at 98–100.)

In response, Jaqueline Massey points out that Conner's argument asks the Court to ignore Phillips's own testimony that he fired his gun in part because he heard Conner's shot, thinking instead that it was Cameron Massey shooting at him. (Doc. 159 at 42; Doc. 134-3 at 11–12.) Although he did not know at the time that it was Conner who had fired his weapon, Phillips explicitly identified the sound of Conner's gunshot as one of the reasons he shot Cameron Massey.

Conner is correct that, in Alabama, § 1983 claims brought on behalf of a decedent may only be asserted through Alabama's wrongful death statute, but that statute has been read to allow for a claim "when a constitutional violation actually causes the injured person's death." *Estate of Gilliam ex rel. Waldroup v. City of Prattville*, 639 F.3d 1041, 1047–48 (11th Cir. 2011). The term "actually causes" has been interpreted to include proximate causation. *Carr v. Marshall Cnty. Sheriff's Office*, No.: 4:11-cv-02834, 2013 WL 1834471, at *3 (N.D. Ala. Apr. 30, 2013). Therefore, the question here is whether there is a sufficient connection between the constitutional violation alleged against Conner and Cameron Massey's death. The Court finds that there is.

Phillips affirmed in his sworn declaration that hearing Conner's shot, along with his being dragged as the Infiniti moved forward, prompted Phillips to fire his weapon. (Doc. 134-3 at 11–12.) Phillips shot at Massey four times, ultimately killing him. Because Conner's shot, in part, triggered Phillips's deadly shot, the Court finds that there is sufficient evidence for a jury to conclude that Conner's shot could have been a contributing causal factor in Cameron Massey's death.[10] Conner is not entitled to summary judgment under his abatement theory.

### B.    Qualified Immunity

---

[10] While the Court finds that a jury could conclude that Conner's shot was a contributing or proximate cause of Cameron Massey's death, this should not be read as the Court's finding that Conner violated Cameron Massey's constitutional rights when he fired his weapon.

The Court now turns to the Defendants' assertion of qualified immunity. The qualified immunity doctrine protects an officer from suit unless at the time of his supposedly wrongful act the law was "already established to such a high degree" that every objectively reasonable officer in his circumstances would be "on notice" that what he was doing was "clearly unlawful." *Pace v. Capobianco*, 283 F.3d 1275, 1282 (11th Cir. 2002). For qualified immunity to apply, an officer must first establish that he was acting within his discretionary authority. *Morton v. Kirkwood*, 707 F.3d 1276, 1280 (11th Cir. 2013).

Here, Jaqueline Massey in her brief does not challenge Conner and Phillips's discretionary authority. (*See* Doc. 159.) Therefore, the Court moves to the next step of the qualified immunity analysis, that is, Massey's burden to "establish that the defendant violated a constitutional right" and that the right violated was "clearly established" by law. *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1199 (11th Cir. 2007); *see also Powell v. Snook*, 25 F.4th 912, 920 (11th Cir. 2022) ("To overcome a qualified immunity defense where the defendant acted within his discretionary authority, the plaintiff must show that the defendant's actions not only violated one or more constitutional rights, but also that it was clearly established at the time that those specific actions did so."). Courts may consider these prongs in either order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009) ("The judges of the district courts and the courts of appeals should be permitted to

exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.").

The parties vehemently disagree as to whether there was a constitutional violation here. They disagree with equal force as to whether Cameron Massey's constitutional right to be free from the use of deadly force under these facts was clearly established at the time he was killed. Because the clearly established analysis is dispositive here, the Court begins with a discussion of the applicable law at the time of Cameron Massey's death.

"Qualified immunity attaches when an official's conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (per curiam) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam)). A right is "clearly established" when it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix*, 577 U.S. at 11 (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). In considering whether a right is "clearly established," relevant law "consists of holdings of the Supreme Court, the Eleventh Circuit, or the highest court of the relevant state." *Sebastian v. Ortiz*, 918 F.3d 1301, 1307 (11th Cir. 2019).

Although a case need not be directly on point for a right to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." *White*, 37 S. Ct. at 551 (quoting *Mullenix*, 577 U.S. at 12). This inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Rivas-Villegas*, 142 S. Ct. at 8 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam)).

In the context of excessive force claims, the Eleventh Circuit previously has noted that "generally no bright line exists for identifying when force is excessive." *Priester v. City of Riviera Beach,* 208 F.3d 919, 926 (11th Cir. 2000). Therefore, "unless a controlling and materially similar case declares the official's conduct unconstitutional, a defendant is usually entitled to qualified immunity." *Id.*

Jaqueline Massey has not identified any Supreme Court or Eleventh Circuit precedent that would have put either Conner or Phillips on notice in 2013 that their actions under these facts violated the Fourth Amendment. Instead, based on the events that transpired during the traffic stop, then-existing case law actually supports Conner and Phillips's use of deadly force.

The Eleventh Circuit has routinely held that law enforcement officers are permitted to use deadly force when a suspect is utilizing an automobile as a weapon. *McCullough v. Antolini,* 559 F.3d 1201, 1207 (11th Cir. 2009). As it noted in its *McCullogh* decision in 2009, "[w]e have . . . consistently upheld an

officer's use of force and granted immunity in cases where the decedent used or threatened to use his car as a weapon to endanger officers or civilians immediately preceding the officer's use of deadly force." *Id.*

Citing *McCullough,* in 2012, the Eleventh Circuit further expounded on the ability to use deadly force in a traffic stop, noting that qualified immunity is regularly granted in instances that "involved a driver using a vehicle 'in a dangerous and aggressive manner' that provided the officers with ample reason to believe that the driver 'posed a threat of serious physical harm or death to the officers, or other passerby, especially in light of the speed with which the incident unfolded.'" *Terrell v. Smith,* 668 F.3d 1244, 1254 (11th Cir. 2012) (quoting *McCullough*, 559 F.3d at 1208).

This remains true even in circumstances where the vehicle never makes contact with the officer's body. *See Robinson v. Arrugueta*, 415 F.3d 1252, 1256 (11th Cir. 2005) (holding the use of deadly force was justified where the suspect drove toward the officer at one to two miles per hour because "[e]ven if in hindsight the facts show that [the officer] perhaps could have escaped unharmed . . . a reasonable officer could have perceived that [decedent] was using the [vehicle] as a deadly weapon . . . [and thus the officer] had probable cause to believe that [decedent] posed a threat of serious physical harm.").

The Eleventh Circuit has also unequivocally held that an officer's use of deadly force is not limited to protecting his own life and safety but may also be used in protecting his fellow officers. *See, e.g., Carr v. Tatangelo,* 338 F.3d 1259, 1269–70 (11th Cir. 2003) (holding that a law enforcement officer was entitled to qualified immunity where, during a rapidly escalating situation, he perceived an apparent imminent threat to his fellow officer); *Nicarry v. Cannaday,* 260 F. App'x 166, 171 (11th Cir. 2007) (per curiam) ("[A]n officer's reasonable use of deadly force is not limited to protecting himself from serious physical harm. An officer may also reasonably use deadly force if he has probable cause to believe that a suspect poses an imminent threat of serious physical harm to his fellow officers.").

Based on the ample, controlling case law as it existed at the time of Cameron Massey's death in 2013, neither Conner nor Phillips would not have been on notice that their use of deadly force during the traffic stop was "clearly unlawful" in the circumstances presented to them at that moment.

As to Conner, it would not have been "clearly unlawful" for Conner to use deadly force under the circumstances here when among other facts Cameron Massey, a non-compliant passenger, disobeyed commands concerning the placement of his hands, unexpectedly leaned over into the driver side of the vehicle, turned on the vehicle's engine, engaged the transmission, reached down into the floorboard, pressed the accelerator while Phillips (a fellow law

enforcement officer) was leaning into the driver-side window, and forced the vehicle forward in an uncontrolled manner that Conner perceived to be endangering to Phillips's life.

And as to Phillips, it would not have been "clearly unlawful" to use deadly force where, in a matter of a few seconds, Cameron Massey (a believed drug trafficker) was non-compliant with officer commands, unexpectedly leaned into the floorboard in what was perceived as effort to grab a weapon, became physically combative, turned on the vehicle and engaged the transmission, and suddenly pressed the accelerator causing the vehicle to uncontrollably move forward with some portion of Phillips's body inside the vehicle while at the same time hearing another gunshot (deadly force) from whom he believed to be Cameron Massey, circumstances which Phillips believed put himself and others in immediate harm. *See, e.g., Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 821 (11th Cir. 2010) (deadly force was reasonable when the officer was "suddenly confronted" by the suspect and "forced to decide in a matter of seconds whether to deploy deadly force"); *Carr*, 338 F.3d at 1273–74 (qualified immunity applied to officer who after hearing a fellow officer shoot one round, fired his gun eight times in order to eliminate the threat); *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1246 (11th Cir. 2003) (per curiam) (concluding an officer's use of deadly force was objectively reasonable where the suspect posed an imminent threat of violence to

the officer because he ignored the officer's repeated commands and charged an armed officer with a stick); *Clark v. City of Atlanta,* 544 F. App'x 848, 857 (11th Cir. 2013) (per curiam) (police officers "acted reasonably in continuing to shoot at [decedent] until the threat of serious physical harm was eliminated and [decedent] was fully secured"); *see also Torres v. Howell,* No. 20-14646, 2022 WL 1664355, at *4 (11th Cir. May 25, 2022) (per curiam) (quoting *DeLuna v. City of Rockford,* 447 F.3d 1008, 1013 (7th Cir. 2006) (an officer "need not wait until there is a physical struggle for control of his weapon before a situation presents an imminent danger of serious physical injury")); *Robinson*, 415 F.3d at 1256; *Terrell,* 668 F.3d at 1254–55.

Because the right at issue here was not clearly established, the Court pretermits discussion of whether there was a constitutional violation. *Pearson*, 555 U.S. at 236–37. Conner and Phillips are each entitled to qualified immunity, and summary judgment is due to be granted in their favor as to the Fourth Amendment excessive force claim.

## State Law Wrongful Death Claim

In Count II, Jaqueline Massey brings a state law claim against Conner and Phillips under Alabama's wrongful death statute, Ala. Code § 6-5-410. Because the Court has determined that Conner and Phillips are entitled to summary judgment on the sole federal claim, the Court elects not to exercise jurisdiction over the state

law claim. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 726 (1966) ("Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well."); *see also Baggett v. First Nat'l Bank of Gainesville*, 117 F.3d 1342, 1353 (11th Cir. 1997) ("State courts, not federal courts, should be the final arbiters of state law."); *Ingram v. School Bd. of Miami-Dade Cnty.*, 167 F. App'x 107, 108 (11th Cir. 2006) (per curiam) ("Where . . . a court has dismissed all federal claims from a case, there is a very strong argument for dismissal, especially where the federal claims are dismissed prior to trial."). Accordingly, the state law claims against Conner and Phillips will be dismissed without prejudice.

## CONCLUSION

The Court recognizes the great loss that occurred here. Cameron Massey's death is awful and unfortunate. The Court has given thoughtful, deliberate consideration to the issues presented in this litigation. Based on the material facts of this case—as supported by the evidentiary record including video footage and neutral eyewitness testimony —and controlling case law, the Court cannot find that either Conner or Phillips would have been on notice that their use of deadly force against Cameron Massey was clearly unconstitutional under these facts. It is therefore ORDERED as follows:

    1.  The stay (Doc. 178) imposed in this case is LIFTED;

2. The Defendants' Motion for Summary Judgment (Doc. 133) is GRANTED as to the federal claim in Count I;

3. The Plaintiff's state law claim in Count II is DISMISSED without prejudice; and

4. All other pending motions (Docs. 136, 138, 145, 180, 181, 185, 186) are DENIED as moot.

A separate final judgment will issue.

DONE, this the 16th day of September, 2022.

_____/s/ R. Austin Huffaker, Jr._____
R. AUSTIN HUFFAKER, JR.
UNITED STATES DISTRICT JUDGE